UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

KEYSTONE FRUIT MARKETING,
INC., and BOB N. EVANS ,

     Plaintiffs,

     v.

WILLIAM G. BROWNFIELD;
JANET H. BROWNFIELD; and
JANET M. CLAYTON,

     Defendants and Third-
     Party Plaintiffs,

     v.

WALLA WALLA RIVER
KEYSTONE, LLC; WALLA
WALLA RIVER FARMS, LLC;

     Third-Party
     Defendants.

NO.  CV-05-5087-RHW

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT *INTER
ALIA***

     Before the Court are Defendant Brownfield's Motion for Summary Judgment (Ct. Rec. 90), Defendant Clayton's Motion for Summary Judgment (Ct. Rec. 101), Plaintiff Evans' Cross-Motion for Summary Judgment (Ct. Rec. 137), Plaintiff Keystone Fruit Marketing's (KFM) Motion to Compel Discovery From Brownfield (Ct. Rec. 156), Third Party Defendant Walla Walla River Keystone's Motion for Order to Show Cause (Ct. Rec. 162), KFM's Motion to Strike Summary Judgment Proceedings (Ct. Rec. 182), and Letter From George M. Ahrend to Hon. Robert H. Whaley (Ct. Rec. 195).  A hearing was held on May 16, 2006, in Richland, Washington.  Plaintiff Bob Evans was present, and he and KFM

1   were represented by George Ahrend and William Gilbert.  Mr. Ahrend and Mr.

2   Gilbert also appeared on behalf of Walla Walla River Keystone.  Defendants

3   William and Janet Brownfield were present and represented by John Schultz;

4   Defendant Janet Clayton was present and represented by John Lohrmann.

5       This case involves alleged violations of the Computer Fraud & Abuse Act,

6   18 U.S.C. § 1030, Uniform Trade Secrets Act, Wash. Rev. Code § 19.108.010, and

7   tortious interference with economic relations, breach of duties of confidentiality

8   and loyalty, and breach of employee handbook against Mr. Brownfield and Ms.

9   Clayton.  Additionally, Mr. Brownfield faces claims for breach of a covenant not to

10  compete and unpaid promissory notes.  The Brownfield Defendants have also filed

11  claims against Third Party Defendants Walla Walla River Keystone and Walla

12  Walla River Farms, and they allege counterclaims against KFM.

13                            **STANDARD OF REVIEW**

14      Summary judgment is appropriate if the "pleadings, depositions, answers to

15  interrogatories, and admissions on file, together with the affidavits, if any, show

16  that there is no genuine issue as to any material fact and that the moving party is

17  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party

18  has the initial burden to prove that no genuine issue of material fact exists.

19  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Once

20  the moving party has carried its burden under Rule 56, its opponent must do more

21  than simply show that there is some metaphysical doubt as to the material facts.  *Id*.

22  The party opposing summary judgment must go beyond the pleadings to designate

23  specific facts establishing a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477

24  U.S. 317, 325 (1986).  When considering a motion for summary judgment, a court

25  may neither weigh the evidence nor assess credibility; instead, "the evidence of the

26  non-movant is to be believed, and all justifiable inferences are to be drawn in his

27  favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Nonetheless,

28  summary judgment is required against a party who fails to make a showing

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 2

sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim.  *Celotex*, 477 U.S. at 322-23.

## FACTS

Keystone Fruit Marketing, Inc. (KFM) is a Pennsylvania business corporation which markets and sells a variety of produce worldwide.  Defendant Bill Brownfield began working as the Sales Manager of the Northwest Office of KFM on April 23, 1996.  Defendant Janet Clayton began working as a Sales Assistant for KFM on January 2, 2002.  In May 2001, Bob N. Evans and Kurt J. Schweitzer, who are both shareholders, officers and directors of KFM, joined with Bill Brownfield to become one-third members and owners of Walla Walla Keystone, LLC (WW Keystone).  WW Keystone is a Pennsylvania limited liability company formed for the purpose of making investments and engaging in agricultural pursuits in the Walla Walla area.  To accomplish these goals, WW Keystone became involved in an onion farm, Walla Walla River Farms, LLC (WWR Farms) and an onion curing, packing and storing facility, Walla Walla River Packing & Storage, LLC (P&S).  WW Keystone became a one-half member of WWR Farms, and Mr. Brownfield, Mr. Evans and two others were named as managers.  WW Keystone also became one-half member of P&S, with The Hamada Group (Hamada) and Michael F. Locati (Locati) owning the other half.

### A. Promissory Notes

At the time members of WW Keystone contemplated the company's investment in WWR Farms and P&S, Mr. Brownfield did not have enough money to finance his own participation in the ventures of WW Keystone.  Over a three year period, from June 6, 2001, until May 24, 2004, Mr. Evans loaned Mr. Brownfield a total of $291,653.80 through eight separate loan installments, resulting in six unpaid promissory notes.

The first two promissory notes provide, "this amount is to be repaid in full

from the first profits generated in my name from the Walla Walla Keystone, LLC."
The following four promissory notes contain the same clause with the addition of
". . . or as otherwise agreed." (Ct. Rec. 136, Exs. 14 & 15). On July 1, 2003, Mr.
Brownfield signed a compensation agreement with KFM in which he agreed to
"repay the WW loans to BNE [Bob Evans] and KS [Kurt Schweitzer] at the
minimum rate of at least $2000.00 per month until interest and principal are paid in
full—as agreed upon in separate documents." (Ct. Rec. 136, Ex. 39). Mr.
Brownfield has since repaid principal and interest in the amount of $101,578,
leaving a balance due of $229,961 as of March 31, 2006. (Ct. Rec. 136, No. 9).

In the minutes of the first annual meeting of WW Keystone, the following
agreement was recorded: "Said personal loans will be repaid to Bob N. Evans and
Kurt J. Schweitzer out of the profits of the company; however, if the company does
not generate sufficient profits to repay said personal loans than [sic] the parties will
make other arrangements for the repayment of said loans." (Ct. Rec. 136, Ex. 38).
Mr. Brownfield denies that he ever agreed to personally make any contributions to
the business. (Ct. Rec. 168, No. 29).

**B. Termination of Employment**

For three years prior to July 11, 2005, KFM had a contract as exclusive
marketer of onions grown by Grigg and Sons that averaged $1 million per year in
income for KFM. Mr. Brownfield negotiated this contract for KFM. In 2005, Mr.
Brownfield assured Mr. Evans that a contract with Grigg and Sons had been
obtained through the 2006 season, but a signed copy of the contract was never
found. (Ct. Rec. 145, No. 2). On July 11, 2005, Mr. Brownfield forwarded an e-
mail to Mr. Evans with an attachment stating that Grigg and Sons was terminating
their 2006 contract with KFM and was starting its own competing marketing
company, Sweet Clover Produce, LLC (Sweet Clover). (Id., Nos. 3 & 4). On July
13, 2005, Mr. Brownfield took a personal day to meet with Lorin Grigg. Mr.
Evans fired Mr. Brownfield on July 14, 2005. That same day Ms. Clayton

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 4

terminated her employment.  On July 18, 2005, Sweet Clover opened its new office with Mr. Brownfield and Ms. Clayton as employees.

KFM asserts that for the seven months prior to his termination, Mr. Brownfield knew that Grigg and Sons was thinking about opening a competing marketing company and talked with Mr. Grigg about "what it would entail to open a marketing office." (Ct. Rec. 145, No. 11).  Mr. Grigg also informed Mr. Evans that Mr. Brownfield was "involved" in the termination of the contract and the startup of Sweet Clover.  (Id., No. 5).  Mr. Brownfield disputes this claim and purports that he did not know that the Griggs were opening up a marketing office to market onions until after his termination.  (Ct. Rec. 145-8, Dep. Def. Brownfield, at 287).  In the spring of 2005, several months before he was fired by KFM, Mr. Brownfield procured onion seed on behalf of Grigg and Sons without KFM's knowledge.  (Ct. Rec. 145, No. 13).  On July 8, 2005, Mr. Grigg's wife sent an e-mail to Mr. Brownfield's wife insinuating that Mr. Brownfield had knowledge of Mr. Grigg's intention to form a startup company and had been involved in the preparation for the "big move." (Ct. Rec. 145, No. 14).

On July 14, 2005, before Mr. Brownfield was fired, Mr. Evans met with Ms. Clayton, a Sales Assistant at the Northwest Office of KFM, to explain the situation involving Mr. Brownfield. At that time, Ms. Clayton had already cleaned out her desk, and explained she was "going with Bill," suggesting that she already knew Mr. Brownfield was going somewhere else and that there was a job for her there. On July 18, 2005, she began work as a Sales Assistant for Sweet Clover.

## C.  Computer Files

After Mr. Brownfield was terminated and Ms. Clayton resigned from KFM they accessed several KFM documents without KFM's permission from several computers, principally a company laptop.  On July 8, 2005, after his last communication with a KFM customer, Mr. Brownfield accessed "Billscustomerlist.xls."  "Billscustomerlist.xls" contains names, addresses,

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 5

telephone numbers, e-mail addresses, buyer information, assistant buyer information, transportation personnel, inspectors, receiver information, and other contact information. It also contains information about prospective customers. KFM asserts that the information compiled is not available to the public and is password protected. (Ct. Rec. 145, Nos. 53, 55, & 56). Defendants insist that the information contained in "Billscustomerlist.xls" was available to the public. (Ct. Rec. 177, Aff. Def. Clayton, No. 13).

Ms. Clayton also e-mailed "Billscustomerlist.xls" and other files from her personal computer to her computer at Sweet Clover on August 2, 2005, after her resignation from KFM. "Billscustomerlist.xls" was the only document that she e-mailed that contained potentially confidential information. Ms. Clayton had backup files containing other KFM documents at her home, but it is undisputed that she destroyed them without accessing confidential material. (Ct. Rec. 104, Aff. Def. Clayton, No. 12).

Mr. Brownfield also retained one of his two company laptops for nearly two weeks after his termination, and on July 15, 2005, Mr. Brownfield and Ms. Clayton opened "Copy of WW Forecasts.xls" and "WALLA WALLA PRICING 2005.xls" from the laptop. "Copy of WW Forecasts.xls" is a confidential KFM document used as a sales and forecasting tool containing historical data of every customer that purchased onions from 2002 to 2004, the quantity they purchased on a week-by-week basis, and weekly projections for individual customers on a week-by-week basis. "WALLA WALLA PRICING 2005.xls" is a spreadsheet created by Ms. Clayton containing prices offered by KFM broken down by onion size, packing style and location of sale on a week-by-week basis. KFM asserts both of these documents were compiled by KFM employees on KFM computers, cost money to create, contain compilations of information not available to the public, and are protected by passwords. (Ct. Rec. 145, Nos. 47-49). KFM has allegedly incurred expenses over $47,000 "responding to" Mr. Brownfield and Ms.

Claytons' access to these computer files.

**D. Employee Handbook**

During the course of their respective terms of employment, Mr. Brownfield and Ms. Clayton both received and agreed to comply with a KFM employee handbook. Mr. Brownfield received a copy of KFM's employee handbook in 1998, two years after he began working at KFM, and at that time he signed a statement acknowledging his receipt of the handbook and his agreement to comply with the terms. He repeated the same process for the revised employee handbook in 2001 and in 2004. Ms. Clayton received a copy of KFM's employee handbook at the beginning of her employment in 2002. She also signed a statement acknowledging her receipt of the handbook and agreed to comply with its terms for the revised employee handbook in 2004.

The employee handbook prohibits outside employment without prior written approval of KFM, conflicts of interest, disclosure of "confidential business information" and "trade secrets," and requires that employees return all KFM property after termination. The Employee Acknowledgment Form signed by Mr. Brownfield and Ms. Clayton refers to the employee handbook as a "guideline" and states, "I acknowledge that this handbook is neither an expressed or implied contract of employment, nor a legal document." The form also provides that the signer has the "responsibility to read and comply with the policies contained in the handbook."

**E. Covenant Not to Compete**

On behalf of WW Keystone, both Mr. Brownfield and KFM signed an operating agreement for WWR Farms that contained a Covenant not to Compete. The Covenant restricts competition with WWR Farms concerning the growing and packing of onions in the Walla Walla valley for two years. The Covenant not to Compete does not restrict marketing. The Covenant states that "all parties recognize that this non-competition agreement applies to . . . Keystone Fruit

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 7

Marketing, Inc. . . . [and] William Brownfield."  Competition is allowed "upon the express written consent of the other parties and affiliates who sign the agreement."

## DISCUSSION

### I. Motions for Summary Judgment

In light of these facts, Defendants Mr. Brownfield and Ms. Clayton move for summary judgment on all asserted claims (Ct. Recs. 90 & 101).

### A.  Computer Fraud and Abuse Act (CFAA)

KFM asserts three separate violations of the CFAA by Defendants Brownfield and Clayton:

(1) Ms. Clayton violated 18 U.S.C. § 1030(a)(2)(C) by sending e-mails with an attachment containing "Billscustomerlist.xls."  A violation of § 1030(a)(2)(C) occurs when one (1) intentionally accesses a computer (2) without authorization or by exceeding authorized access, and thereby (3) obtains information from any protected computer if the conduct (4) involved an interstate or foreign communication.  18 U.S.C. § 1030(a)(2)(C).

(2) Both Mr. Brownfield and Ms. Clayton violated 18 U.S.C. § 1030(a)(4) by accessing "Copy of WW Forecasts.xls" and "WALLA WALLA PRICING 2005.xls" from the KFM laptop.  A violation of § 1030(a)(4) occurs when one (1) accesses a protected computer (2) without authorization or by exceeding authorized access, (3) has done so knowingly and with intent to defraud, (4) thereby furthering the intended fraud and obtaining anything of value.  18 U.S.C. § 1030(a)(4).

(3) Both Mr. Brownfield and Ms. Clayton violated 18 U.S.C. § 1030(a)(5) by accessing these same documents.  A violation of  § 1030(a)(5) occurs when one (1) intentionally accesses a protected computer (2) without authorization, and (3) as a result of such conduct, causes damage (4) which results in loss to one or more persons during any 1-year period aggregating at least $5,000 in value.  18 U.S.C. §§ 1030(a)(5)(A)(iii) & B(i).

In the last few years, courts have broadly construed the language of the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 8

CFAA to prevent employees and/or former employees from gaining unauthorized access to an employer's computers to obtain proprietary information, such as trade secrets, useful in a competing business venture.  *See, e.g.*, *EF Cultural Travel BV, EF v. Explorica, Inc.,* 274 F.3d 577 (1st Cir. 2001); *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp. 2d 1188 (E.D. Wash. 2003); *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000) (construing "fraud" as mere wrongdoing and "damage" as including monetary loss caused by disclosure of trade secrets).

In spite of the expanding application of the CFAA in employment settings, § 1030(g) of the 2001 Amendment to the CFAA limits civil remedies to claims alleging one of the harms expounded in § 1030(a)(5)(B).  Section 1030(g) states that a civil action may only be brought for a violation of the CFAA if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv) or (v) of subsection (a)(5)(B).  18 U.S.C. § 1030(g).  Here, the only applicable section of (a)(5)(B) is (a)(5)(B)(i): "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  *Id*. § 1030(a)(5)(B)(i).  "The term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting damage assessment and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred or other consequential damages incurred because of interruption of service."  *Id*. § 1030(e)(11).

In regard to Count 1, Ms. Clayton accessed her home computer and e-mailed an attachment of "Billscustomerlist.xls" to her business account at Sweet Clover.  In order to sustain a claim under § 1030(a)(2)(C), one must intentionally access a computer "without authorization" or "exceeding authorized access."  In this case, Ms. Clayton accessed her home computer to attach "Billscustomerlist.xls" and email it to her work account.  Ms. Clayton was obviously authorized to use her home computer where "Billscustomerlist.xls" was stored—this access was not

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 9

done without authorization or by exceeding authorization within the meaning of the statute. "The crux of the offense under [the CFAA] . . . is the abuse of a computer to obtain the information." *Shurgard Storage Centers*, 119 F. Supp. 2d at 1128 (quoting S. Rep. No. 104-357, at 3 (1996)). Therefore, the Court must focus on the unauthorized access to a protected computer, not on the unauthorized access or use of electronic data. *Accord Allied N. Am. Ins. Brokerage Corp. of Cal. v. Woodruff-Sawyer*, 2005 WL 2354119, at *4 (N.D. Cal. 2005). The CFAA does not prevent one from accessing his or her personal computer and the documents contained within it. *Id.* Therefore, KFM has failed to satisfy this essential element, and summary judgment is granted on Count 1.

Regarding Counts 2 and 3, Mr. Brownfield and Ms. Clayton did access a protected computer without authorization when they accessed "Copy of WW Forecasts.xls" and "WALLA WALLA PRICING 2005.xls." The laptop they accessed was the property of KFM, and neither of them worked for KFM at the time. Concerning the fraud issue for Count 2 and the damage issue for Count 3, there is a genuine issue of material fact which requires a factual investigation of Mr. Brownfield and Ms. Clayton's purpose in accessing the documents, their subsequent use of the documents and any damage it caused. Similarly, KFM's asserted $47,000 in loss accrued by "responding to the claim" creates a genuine issue of material fact as to the loss requirement of the CFAA. Therefore, on Counts 2 and 3 of Defendants' alleged CFAA violations, the Court denies summary judgment.

### B.  Uniform Trade Secrets Act (UTSA)

KFM contends that Mr. Brownfield and Ms. Clayton misappropriated trade secrets by accessing and using "Billscustomerlist.xls," "Copy of WW Forecasts.xls," and "WALLA WALLA PRICING 2005.xls" after the termination of their employment contracts at KFM.

A former employee, even in the absence of an enforceable covenant not to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 10

1  compete, remains under a duty not to misappropriate trade secrets acquired in the

2  course of previous employment. *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d

3  427, 437 (1999).   A "trade secret" is information, including a compilation, that

4  derives independent economic value, actual or potential, from not being generally

5  known to, and not being readily ascertainable by proper means by, other persons

6  who can obtain economic value from its disclosure or use, and is the subject of

7  efforts that are reasonable to maintain its secrecy.  Wash. Rev. Code §

8  19.108.010(4).  "To be a trade secret, information must be 'novel' in the sense that

9  the information must not be readily ascertainable from another source."  *Spokane*

10  *Research & Defense Fund v. City of Spokane*, 96 Wash.App. 568, 578 (1999).

11  "Misappropriation" means disclosure or use of a trade secret of another without

12  express or implied consent by a person who used improper means to acquire

13  knowledge of the trade secret.  Wash Rev. Code § 19.108.010(2).  "Improper

14  means" includes breach of a duty to maintain secrecy.  Wash. Rev. Code §

15  19.108.010(1).  Whether information is a trade secret protected by the UTSA is a

16  matter of law.  *Nowogroski,* 137 Wash.2d at 436.

17      Defendants contend the three KFM documents in question are not trade

18  secrets within the meaning of the statute because they contain information readily

19  accessible by anyone in the industry and therefore have no value.

20      "Billscustomerlist.xls" is a compilation of the names, locations, and contact

21  information for the companies to which KFM sells onions.  Compilations of

22  customer information have traditionally been interpreted as trade secrets.  *See e.g.*

23  *id.* at 442-443 ("Customer identities and related customer information can be a

24  company's most valuable asset and may represent a considerable investment of

25  resources.").  However, this holds true only where the information is not known or

26  readily ascertainable by a person who could gain economic value from its

27  disclosure or use.  Wash. Rev. Code § 19.108.010(4).  Defendants assert the

28  identities of and information about customers of Walla Walla sweet onions are

readily available in the Blue Book and are well known in the produce industry. (Ct. Rec. 104, Aff. Def. Clayton, No. 12).  Additionally the vast majority of onions are sold to a handful of major customers.  (Id.)  Plaintiffs have presented no evidence to contradict this assertion.  Therefore, because the customer information in "Billscustomerlist.xls" is both generally known and readily ascertainable to people in the industry, it does not constitute a trade secret as a matter of law. Wash. Rev. Code § 19.108.010(4).

The other two documents accessed by Defendants, "Copy of WW Forecasts.xls" and "WALLA WALLA PRICING 2005.xls," are compilations of sales information containing week-by-week records of onions sales, prices, locations, and future forecasts.  This information is specific to KFM and not generally known or readily ascertainable by competitors.  Furthermore, specific sale information would be valuable to a competitor involved in the marketing of sweet onions in Walla Walla.  For the reasons stated, "Copy of WW Forecasts.xls," and "WALLA WALLA PRICING 2005.xls," are trade secrets as a matter of law.

Because both Mr. Brownfield and Ms. Clayton admittedly accessed these documents from KFM computers after they began working for Sweet Clover, Plaintiffs have met their burden of establishing an issue of material fact as to whether Defendants misappropriated these trade secrets.  Therefore, the Court denies Defendants' motions for summary judgment for violation of the UTSA.

### C.    Tortious Interference with Economic Relations and Breach of Common Law Duty of Loyalty

KFM maintains that both Mr. Brownfield and Ms. Clayton tortiously interfered with KFM's economic relations and breached their duty of loyalty as employees of KFM through their participation in Grigg and Sons' termination of its exclusive marketing contract with KFM and the subsequent formation of the competing marketing venture, Sweet Clover.  While these claims contain distinct legal elements, the facts substantiating each claim are similar.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 12

1    A claim for tortious interference with economic relations requires the

2    following elements: (1) a valid contractual relationship or business expectancy; (2)

3    knowledge of that relationship by the defendants; (3) intentional interference by

4    the defendants inducing or causing a breach or termination of the relationship or

5    expectancy; (4) interference by the defendants based on an improper purpose or

6    improper means; and (5) damages. *Citoli v. City of Seattle,* 115 Wash.App. 459,

7    486 (1989). The economic interference must be wrongful by some measure

8    beyond the fact of the interference itself; this "duty of non-interference" can be

9    established by a statute or other regulation, or a recognized rule of common law, or

10   an established standard of trade or profession. *Pleas v. City of Seattle,* 112

11   Wash.2d 794, 804 (1989).

12   Even where no covenant not to compete exists, Washington courts enforce a

13   common law duty of loyalty between an employee and his current employer. *See*

14   *Kieburtz & Associates, Inc. v. Rehn*, 68 Wash.App. 260, 265-266 (1992). "During

15   the period of his or her employment, an employee is not 'entitled to solicit

16   customers for [a] rival business' or to act in direct competition with his or her

17   employer's business." *Kieburtz,* 68 Wash.App. at 265 (quoting *Restatement*

18   *(Second) of Agency* § 393, comment e (1958)).

19   Plaintiffs present sufficient evidence to create a genuine issue of material

20   fact as to whether Mr. Brownfield's actions during the seven months prior to his

21   termination constitute either tortious interference with economic relations or

22   breach of duty of loyalty. Mr. Brownfield's motion for summary judgment is,

23   therefore, denied on these issues.

24   Plaintiffs have not presented any evidence that precludes a summary

25   judgment on these issues in regard to Ms. Clayton. Ms. Clayton performed clerical

26   duties as a sales assistant for KFM. Plaintiffs present no evidence that she knew of

27   Grigg and Sons' plan to terminate its exclusive marketing contract with KFM or

28   that she planned on working for Sweet Clover before she cleared out her desk on

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 13

July 14, 2005.  Defendant Clayton flatly contradicts Plaintiffs' allegations.  (Ct. Rec. 104, Aff. Def. Clayton, Nos. 4-8).  Plaintiffs' evidence, or lack thereof, also fails to implicate Ms. Clayton in a claim for aiding and abetting Mr. Brownfield in his alleged tortious actions toward KFM.  Viewed in a light most favorable to the non-moving party, Plaintiffs have not designated specific facts establishing a genuine issue for trial as to Ms. Clayton's alleged tortious interference and breach of the duty of loyalty.  Therefore, the Court grants Ms. Clayton's motion for summary judgment on these issues.

### D.  Breach of "Employee Handbook"

KFM alleges both Mr. Brownfield and Ms. Clayton breached the employee handbook to which they agreed to be bound.

Provisions of employee handbooks can be enforced as contractual obligations.  *Korslund v. Dynacorp Tri-Cities Servs., Inc.,* 156 Wash.2d 168, 187 (2005).  These may be express or implied.  *Rowe v. Vaagen Bros. Lumber, Inc.*, 100 Wash.App. 268, 274 (2000).  To determine if handbook policies are meant to be contractual, the Court must look to the parties' intent.  *Brown v. Scott Paper Worldwide Co.*, 143 Wash.2d 349, 364-365 (2001).  An employer can disclaim any intent to make the provisions of an employee handbook part of the employment relationship by a conspicuous disclaimer stating that nothing in the handbook is part of the employment relationship, but instead is a general statement of company policy.  *Carlson v. Lake Chelan Community Hosp.*, 116 Wash.App. 718, 730 (2003).  If the contract is ambiguous, the doubt created by the ambiguity will be resolved against the drafter of the contract.  *Felton v. Menan Starch Co.,* 66 Wash.2d 792, 797 (1965).

KFM contends that Defendants are bound by the Employee Handbook as a contractual obligation.  Both signed an Employee Acknowledgment Form (Form) which states, "I have received this handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and

1  any revisions made to it." Defendants respond that the Form clearly provides,

2  "[f]urthermore, I acknowledge that this handbook is neither an express or implied

3  contract of employment, nor a legal document." The Form also refers to the

4  handbook as a "guideline."

5      In creating the Form, KFM inserted a disclaimer clearly meant to eliminate

6  at least some contractual obligation from the employee handbook. The disclaimer,

7  "this handbook is neither an express or implied contract of employment," is limited

8  to contracts of employment and would not preclude contractual duties involving

9  disclosure of confidential information. The second clause of the disclaimer, "nor a

10  legal document," while ambiguous, has broad preventative potential. It would be a

11  stretch to find that while the handbook is a contract, enforceable in a court of law,

12  it is somehow not a legal document. Therefore, while the term "legal document" is

13  ambiguous, it likely was intended to preclude all contractual obligation relating to

14  the employee handbook. This Court, in resolving ambiguities against the drafter,

15  finds as a matter of law that the employee handbook was not a contract, but a

16  "guideline" describing company policies and grants summary judgment for Mr.

17  Brownfield and Ms. Clayton on this claim.

18      **E.  Breach of "Covenant Not to Compete"**

19      KFM contends that Mr. Brownfield breached a two-year Covenant Not to

20  Compete enforceable by KFM as a third-party beneficiary when he began working

21  for Sweet Clover following his termination from KFM.

22      To create a third party beneficiary contract, the parties must intend that the

23  promisor assume a direct obligation to the intended beneficiary at the time the

24  contract is executed. *Postlewait Constr., Inc. v. Great Am. Ins. Cos.,* 106 Wash.2d

25  96, 99 (1986). The test of intent is an objective one: whether performance under

26  the contract would necessarily and directly benefit the third party. *Donald B.*

27  *Murphy Contractors, Inc. v. King County,* 112 Wash.App. 192, 196 (2002)

28  (citation omitted). An incidental, indirect, or inconsequential benefit to a third

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 15

party is insufficient to demonstrate an intent to create a contract directly obligating the promisor to perform a duty to a third party. *Warner v. Design & Build Homes, Inc.*, 128 Wash.App. 34, 42 (2005). A third party beneficiary can enforce a contract provision only to the extent that the parties to the contract can enforce it. *Shaffer v. McFadden,* 125 Wash.App. 364, 369 (2005).

Both KFM and Mr. Brownfield are promisors in a covenant not to compete against WWR Farms. The covenant restricts the growing and packing of onions in competition with WWR Farms for two years. The test of intent involves determining whether the noncompete agreement necessarily and directly benefits KFM. WWR Farms is an onion farm. KFM is a marketing company. The covenant does not apply to marketing. These facts in themselves demonstrate that the covenant was not meant to benefit KFM directly. KFM's only benefit was to be derived indirectly through its exclusive marketing agreement with WWR Farms.

Furthermore, the covenant contains no language from which this Court can infer intent that KFM is a third party beneficiary to the covenant. The covenant "applies" to multiple parties, many of whom like KFM, would be indirectly affected if another grower and packer entered the market. Because no intent can be inferred from the language or any direct benefits conferred on KFM by the covenant, as a matter of law this covenant does not create a third party beneficiary contract with KFM. Therefore, the Court grants summary judgment on this issue.

## F. Unpaid Promissory Notes

Both Plaintiff Bob Evans and Defendants William and Janet Brownfield have filed summary judgment motions on the payment of six unpaid promissory notes. This claim hinges upon whether as a matter of law the contracts, *i.e.*, the promissory notes, contain a condition precedent for payment.

The construction of a contract provision is a matter of law. *Tacoma Northpark, LLC v. NW, LLC*, 123 Wash.App. 73, 80 (2004). An intent to create a

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 16

condition is often revealed by such phrases and words as "provided that," "on condition," "when," "so that," "while," "as soon as," or "after," or language stating that payment is provided "only" from a particular fund. *Vogt v. Hovander*, 27 Wash.App. 168, 178 (1979) (where from the clause "money is to come from the cottage rental proceeds" the court affirmed a finding that payment was not conditioned on availability of cottage rental proceeds). Where it is ambiguous whether words create a promise or an express condition, they are interpreted as creating a promise. *Ross v. Harding*, 64 Wash.2d 231, 236 (1964). "Whether a provision in a contract is a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances." *Id.* Any ambiguity may be explained by extrinsic evidence of facts and circumstances surrounding the transaction. *Lynch v. Higley*, 8 Wash.App. 903, 911 (1973). Where extrinsic evidence is used to establish the conditional nature of a promissory note, it is not barred by the parol evidence rule. *Scott v. Wall*, 55 Wash.App. 404, 408 (1989). Where a written instrument, executed pursuant to a prior verbal agreement or negotiation, does not express the entire agreement or understanding of the parties, the parol evidence rule does not prevent the introduction of extrinsic evidence with reference to matters not provided for in the writing. *Lynch v. Higley*, 8 Wash.App. 903, 910 (1973).

All six promissory notes provide, "this amount is to be repaid in full from the first profits generated in my name from the Walla Walla Keystone, LLC." These promissory notes contain no words that suggest conditional intent of the parties as enunciated in *Vogt*. Therefore, taking into account the preference of Washington courts to interpret ambiguous provisions as promises rather than conditions, the Court looks to the intent of the parties in light of all surrounding circumstances, including extrinsic evidence, in determining the existence of a condition precedent.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 17

The circumstances surrounding the contracts suggest that the parties intended the repayment of the promissory notes to be an unconditioned promise. Several pieces of evidence suggest that repayment was in fact unconditional. First, in the minutes of the first annual meeting of WW Keystone, the following agreement was recorded: "Said personal loans will be repaid to Bob N. Evans and Kurt J. Schweitzer out of the profits of the company; however, if the company does not generate sufficient profits to repay said personal loans than [sic] the parties will make other arrangements for the repayment of said loans." Second, the final four promissory notes amend the initial ambiguous clause to read, "this amount is to be repaid in full from the first profits generated in my name from the Walla Walla Keystone, LLC, *or as otherwise agreed*" (italics added). Third, on July 1, 2003, Mr. Brownfield signed a repayment agreement with KFM agreeing to "repay the WW loans to BNE and KS at the minimum rate of at least $2000.00 per month until interest and principal are paid in full—as agreed upon in separate documents." Mr. Brownfield did in fact begin repayment of the promissory notes at this time, totaling $101,578 to date.

The Court finds that at the time of the creation of the promissory notes, the parties intended repayment to be unconditional. Therefore, this Court denies Mr. Brownfield's motion for summary judgment on this issue and grants Mr. Evans' cross-motion for summary judgment. The six promissory notes are unconditional and payable on demand. *See* Wash. Rev. Code § 62A.3-108(a).[1]

**G.  Conclusion**

In regard to Mr. Brownfield's Motion for Summary Judgment (Ct. Rec. 90), the Court denies summary judgment for claims under 18 U.S.C. § 1030(a)(4) and

---

[1] The Court does not address whether the demand obligation may be performed now through payment of $2000 per month in accordance with the parties' later agreement.

18 U.S.C. § 1030(a)(5) of the CFAA; denies summary judgment for claims under the Uniform Trade Secrets Act involving Mr. Brownfield's access to "Copy of WW Forecasts.xls," and "WALLA WALLA PRICING 2005.xls", but grants summary judgment involving Mr. Brownfield's access to "Billscustomerlist.xls"; denies summary judgment for the claims of tortious interference with economic relations and breach of duty of loyalty; grants summary judgment for breach of the employee handbook; grants summary judgment for breach of the covenant not to compete; and denies summary judgment for the unpaid promissory notes.

In regard to Ms. Clayton's Motion for Summary Judgment (Ct. Rec. 101), the Court grants summary judgment on the claim for violation of 18 U.S.C. § 1030(a)(2)(C) of the CFAA; denies summary judgment on the claims for violation of 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(5) of the CFAA; denies summary judgment for claims under the Uniform Trade Secrets Act involving Ms. Clayton's access to "Copy of WW Forecasts.xls," and "WALLA WALLA PRICING 2005.xls", but grants summary judgment involving Ms. Clayton's access to "Billscustomerlist.xls"; grants summary judgment for the claims of tortious interference with economic relations and breach of duty of loyalty; and grants summary judgment for breach of the employee handbook.

Finally, the Court grants Mr. Evans' Cross Motion for Summary Judgment on the Promissory Notes.

**II.  Other Motions**

In its Motion to Compel Discovery From Brownfield, KFM moves to compel Mr. Brownfield to answer questions regarding his solicitation of customers and his employee duties at Sweet Clover (Ct. Rec. 156).  Finding this information to be both not privileged and relevant, this Court grants KFM's Motion to Compel Discovery From Brownfield.

Also before the Court is Third Party Defendant Walla Walla River Keystone's Motion for Order to Show Cause (Ct. Rec. 162) wherein WW

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 19

Keystone requests an order directing Mr. Brownfield to show cause why he should not be found in civil contempt for failure to arbitrate in accordance with this Court's Order Compelling Arbitration (Ct. Rec. 120). Because both WW Keystone and WWR Farms each have their own arbitration agreements with Mr. Brownfield, this Court orders that each may conduct separate arbitrations. Mr. Brownfield is bound by this Court's previous Order (Ct. Rec. 120).

The Court also addresses KFM's Motion to Strike Summary Judgment Proceedings (Ct. Rec. 182) wherein KFM moves to strike page 4, lines 1-18 and page 6, lines 18-27 of the Brownfields' reply brief in support of their motion for summary judgment (Ct. Rec. 169) and page 4, lines 3-18 of Mr. Brownfield's supplemental affidavit filed in support of the Brownfields' motion for summary judgment (Ct. Rec. 168). The Court finds that KFM has not been prejudiced by the noted pleadings and, therefore, denies this motion.

Lastly, in response to the letters indicating the difficulties both parties are having with discovery (Ct. Rec. 195), the Court reaffirms its previous Order (Ct. Rec. 188) that fiscal information from KFM for the period up until Mr. Brownfield's termination on July 14, 2005, should be disclosed by KFM.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant Brownfield's Motion for Summary Judgment (Ct. Rec. 90) is **GRANTED in part, and DENIED in part.**

2. Defendant Clayton's Motion for Summary Judgment (Ct. Rec. 101) is **GRANTED in part, and DENIED in part.**

3. Plaintiff Evans' Cross-Motion for Summary Judgment (Ct. Rec. 137) is **GRANTED**.

4. KFM's Motion to Compel Discovery From Brownfield (Ct. Rec. 156) is **GRANTED**.

5 Third Party Defendant Walla Walla River Keystone's Motion for Order to Show Cause (Ct. Rec. 162) is **GRANTED.**

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT *INTER ALIA* * 20

6.    KFM's Motion to Strike Summary Judgment Proceedings (Ct. Rec. 182) is **DENIED**.

7.    The Court reaffirms its Order Granting in Part and Denying in Part Defendants' Motion to Compel Discovery (Ct. Rec. 188), and Defendant Brownfield's request for fiscal information until July 14, 2005, is **GRANTED.**

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and forward copies to counsel.

**DATED** this 6th day of June, 2006.


*s/ Robert H. Whaley*

ROBERT H. WHALEY
CHIEF UNITED STATES DISTRICT JUDGE




Q:\CIVIL\2005\Keystone Fruit\Keystone.sj.ord2.wpd