UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

KEYSTONE FRUIT MARKETING,
INC., and BOB N. EVANS,

        Plaintiffs,

        v.

WILLIAM G. BROWNFIELD and
JANET H. BROWNFIELD,

        Defendants and Cross-
        Plaintiffs.

NO.  CV-05-5087-RHW

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Plaintiffs brought the above-captioned cause of action against two former employees, Defendant William G. Brownfield and Janet Clayton.[1]  Plaintiffs are asking the Court to find that Defendant Brownfield breached his duty of loyalty and unlawfully interfered with Keystone Fruit Marketing's business relationship or expectancy with Grigg and Sons.[2]  Plaintiffs are seeking community liability on the

---

[1]The claims against Janet Clayton have been resolved and she is no longer a party to this action (Ct. Rec. 331).

[2]The Court granted summary judgment in favor of Janet Clayton with respect to the claims of tortious interference and breach of duty of loyalty. (Ct. Rec. 219).  Plaintiffs also alleged that Defendant William G. Brownfield and Janet Clayton breached the employee handbook to which they agreed to be bound.  The Court found that the employee handbook was not a contract, but a "guideline" describing company policies.  The Court granted summary judgment in favor of Defendants on this claim and also granted summary judgment in favor of

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1**

part of Defendant Janet Brownfield.  Plaintiffs also alleged violations of the
Computer Fraud and Abuse Act and the Uniform Trade Secrets Act.[3]

Plaintiffs seek repayment of the wages paid to Defendant Brownfield during
the period of alleged disloyalty while he was employed by the company and also
seek lost profits from its relationship with Grigg and Sons.  The Brownfield
Defendants counterclaimed against Plaintiff Keystone Fruit Marketing, Inc. for
amounts due under the employment agreement.[4]

A bench trial was held on February 4-7, 2008, in Richland, Washington.

---

Defendant  Brownfield on the covenant-not-to-compete claim.  Plaintiff Bob Evans
also sought to have the Court order Defendant Brownfield to repay the six
promissory notes.  The Court granted summary judgment in favor of Plaintiff
Evans on this claim and judgment was entered against Defendants William and
Janet Brownfield on March 14, 2007 (Ct. Rec. 294).

[3]Previously, the Court granted summary judgment in favor of Defendant
Janet Clayton on Count 1, which alleged that she violated 18 U.S.C. §
1030(a)(2)(c) by sending e-mails with an attachment containing
"Billscustomerlist.xls." (Ct. Rec. 219).  The Court also concluded that "Copy of
WWForecasts.xls" and "WALLA WALLA PRICING 2005.xls" were trade secrets
as a matter of law.  *Id.*  On February 1, 2008, the arbitrator of a related case
involving third-party defendant Walla Walla Keystone, LLC. made a final award
of computer forensic costs.  These costs were the only damages claimed from
KFM's claim for violations of the Uniform Trade Secrets Act and the Computer
Fraud and Abuse Act.  Accordingly, these claims do not remain as independent
claims.  *See* Ct. Rec. 376.

[4]The Court granted summary judgment in favor of Plaintiffs on the
Brownfield Defendants' counterclaims for bonuses allegedly owed for the fiscal
years 2003, 2004, and 2005 (Ct. Recs. 363, 368).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 2**

1  Plaintiffs were represented by George Ahrend and William Gilbert.  Defendants

2  were represented by John Schultz.  Having fully reviewed all the materials

3  submitted by the parties and the record in this matter, the Court enters the

4  following Findings of Fact and Conclusions of Law.

5                          FINDINGS OF FACT

6         The testimony presented to the Court was in direct conflict.  Defendants'

7  case relies on the credibility of Defendant William Brownfield and Lorin Sr. and

8  Lorin Jr. Griggs.  Plaintiffs rely on admissions by the Griggs and Brownfield,

9  along with circumstantial evidence in support of their assertions that Defendant

10  Brownfield violated his duty of loyalty and tortiously interfered with its business

11  expectancy.  The Court finds the circumstantial evidence and the sum of the

12  admissions as presented by Plaintiffs to be more probative of what happened in the

13  course of dealings between Keystone Fruit Marketing, Inc., Defendant William

14  Brownfield and Grigg and Sons.

15        The Court makes the following Findings of Fact:

16        Plaintiff Keystone Fruit Marketing, Inc. (KFM) is a Pennsylvania business

17  corporation that markets and sells a variety of produce worldwide.  KFM began in

18  1977 as marketers of apples and peaches from Pennsylvania, North Carolina,

19  Georgia and New York.  Currently, KFM's largest commodity is onions from

20  Vidalia, Georgia, Peru, and Mexico.  KFM has developed a year-round onion

21  program by using different regions to produce onions.  Based on the Red and Blue

22  Book, KFM has the highest rating for business character in the market.  Plaintiff

23  Bob Evans is a shareholder, officer, and director of KFM.

24        Defendant William Brownfield began working as the Sales Manager of the

25  Northwest Office of KFM on April 23, 1996.[5]  He initially began working out of

26

27        [5]Defendant Brownfield's conduct was on behalf of the marital community

28  composed of him and his wife, Janet Brownfield.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 3**

his home in Richland, Washington; eventually the office was relocated to Walla Walla, Washington.  Prior to being hired by KFM, Defendant Brownfield owned his own marketing business and sold Grigg and Sons onions.  By all accounts, Defendant William Brownfield was a successful onion salesman.

Nevertheless, throughout his tenure at KFM, Defendant Brownfield expressed his dissatisfaction with his compensation package and voiced his displeasure with KFM practices to the local onion growers.  In fact, in March 2003, Defendant Brownfield cleaned out his office and told co-workers that he planned on leaving KFM if he was not adequately compensated.  As a result, Defendant Brownfield and KFM entered into negotiations regarding Defendant Brownfield's compensation.[6]

Grigg and Sons grow onions near Quincy, Washington.[7]  For three years prior to July 11, 2005, as a result of Defendant Brownfield's efforts, KFM was the exclusive marketer of hybrid onions grown by Grigg and Sons.  On July 11, 2005, Grigg and Sons terminated their relationship with KFM and shortly thereafter started their own onion marketing firm, Sweet Clover Produce.

Prior to this, both KFM and Grigg and Sons profited as a result of their

---

[6]During the calendar year July 1, 2002-June 30, 2003, Defendant Brownfield received an annual salary of $97,000.00 and a bonus of $228,304.41.  His total annual compensation was $354,894.32.  During the calendar year July 1,2003-June 30, 2004, Defendant Brownfield received an annual salary of $175,000.00 and a bonus of $84,729.00.  His total annual compensation was $296,859.26.

[7]The Griggs' farm lies outside the Walla Walla marketing order.  Consequently, Grigg and Sons are prohibited from marketing its sweet onions as Walla Walla sweet onions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 4**

business relationship.[8]   KFM had negotiated a lucrative deal between the Griggs and Country Fresh Onion in which Grigg and Son would provide red onions for Wendy's, a fast-food restaurant chain.  The Grigg's exclusive Redwing red onion had special attributes that were desirable in the food service industry, including being consistent in its size and color, having a single center, and storing well for up to six months.  At the time, there was no other onion farmer growing this type of red onion.

In the spring of 2005, Country Fresh Onion was pressing KFM to obtain a signed contract for the 2006 season.  Although Defendant Brownfield told Bob Evans that he had obtained a signed contract, no signed contract was ever located. The Griggs testified that they did not sign the contract, but operated under the terms of the contract, nonetheless.

Meanwhile, relations between Defendant Brownfield and KFM became strained.  Allegations of alcohol use by Brownfield and Tom Barnett, another KFM Walla Walla employee, as well as allegations of other abusive behavior exhibited in the Walla Walla office, were circulating among the customers and growers of KFM.  Defendant Brownfield had expressed his concern to the Griggs that KFM was taking away some of its customers as a result of the Duda Alliance.[9]  He told the Griggs that KFM was cancelling deals that Brownfield had put together for the

---

[8]For the period of July 1, 2002 to June 30, 2003, Grigg and Sons' onions sold for $5,594.305.36; KFM received $447,549.92 in sales commissions; for the period of July 1, 2003 to June 30, 2004, Grigg and Sons onions sold for $10,580,309.83; KFM received $846,350.02 in sales commissions; for the period of July 1, 2004 to June 30, 2005, Grigg and Sons' onions sold for $3,980,027.46; KFM received $319,402.20 in sales commissions.

[9]Duda is a competing onion marketing firm.  The two firms entered into an alliance to supply sweet onions in the national market.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 5**

1  other growers.

2       Things came to a head in October 2004.  A series of meetings took place

3  between the management team at KFM and the local onion growers.  One meeting

4  was held with Grigg and Sons.  Bob Evans, Kurt Schweitzer, and Defendant

5  Brownfield attended, along with Lorin Grigg, Sr. and Lorin Grigg, Jr.  Evans and

6  Schweitzer discussed the perceived problems that were being caused by Defendant

7  and Tom Barnett's alcohol use and alleged abusive behavior and also discussed the

8  reorganization that was to take place at the Walla Walla office of KFM. Another

9  meeting took place with other local onion growers, namely the Hamadas and the

10  Locatis.  At this meeting, Evans presented a handout of the new company policy

11  that indicated KFM would not tolerate drinking at the Walla Walla KFM office.

12       The Griggs viewed this meeting as a personal attack against Defendant

13  Brownfield.  In fact, the local owner growers coined these meetings as the Bill

14  Brownfield Roast.  After this meeting, the Griggs discussed opening their own

15  marketing firm with Defendant Brownfield, and in December 2004, the Griggs

16  reinstated their Washington state license to market onions.

17       Plaintiffs assert that after the October 2004 meeting, Defendant Brownfield

18  began to work with the Griggs to establish a competing onion marketing enterprise.

19  Defendant Brownfield denies this.  The Court does not find Defendant Brownfield

20  credible and the reason for this begins with Defendant's explanation surrounding

21  the July 9, 2005, email that was sent to Janet Brownfield's home computer from

22  Gail Grigg, Lorin Jr.'s wife.

23       The email was captioned: RE: Hello friend/keystone letter for Bill.  In the

24  email, Gail Grigg wrote, in part:

25            Lorin wanted me to forward a copy of the letter I wrote for him,
         for Bill to read.  Here we go, plug your nose and jump in!!! I think
26       Lorin is excited, its just a big move, but he and his dad feel like it is
         the RIGHT one.  Let us know what you guys think of the letter.  We
27       won't be home til late tonight.
         Attached to the email was a document named Keystone Fruit Marketing.doc.
28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 6**

The document was a letter addressed to Keystone Fruit Marketing, Attn: Bill Brownfield, Bob Evans, Kurt Schweitzer.  The letter stated, in part:

> Upon much consideration, we wish to inform you that we will no longer use Keystone Fruit Marketing as our exclusive sales agent, effective 7/11/2005.
> There have been many hours of discussion on this between my father and myself to come up with this decision. We have become increasingly frustrated in the desire we perceive from your office, to market the hybrid onions.  It was our expectation that you were to market out hybrids with your sweet onions and this alliance would get us into the eastern markets.  We have not only felt the hybrids were more or less "in the way", but have also not capitalized on any increase in profits due to additional sales on the east coast.  Also, as we see it, the alliance Keystone has developed with Duda is allowing them to get connected with existing customers we currently sell our hybrids to.  This will naturally lead to a loss of business for our company, as you have aligned yourself with some of our competitors. There seems to be some loyalty issues and a conflict of interest for us in our relationship with Keystone, due to these management decisions. For 2 years now we have been trying to understand or justify this progression, but we have not reached an understanding or agree with it at all.
> Another reason for this decision is that we have decided to form our own marketing sales office, a dream we have had for a number of years.  According to our analysis of our operation, this seems to be the right time for us to start this business venture.

Defendant Brownfield insists that he did not see this email at his home.  He insists that he knew nothing about the Grigg's decision to start a new marketing firm until he showed up to work on July 11, 2005, and saw an email from Lorin Grigg, Jr. that had attached to it a document named Keystone Fruit Marketing.doc. Janet Brownfield testified that she did not recall giving Gail Grigg's email to her husband, and did not know before seeing Gail's email that the Griggs were considering terminating Keystone and opening their own marketing firm.  The Court does not find this testimony credible.[10]

---

[10]Nor does the Court find credible Janet Brownfield's explanation as to why certain emails were deleted from the computer after getting Plaintiff's request for production of the computer files from Plaintiff.  The Court finds that Ms. Brownfield knowingly deleted emails in order to circumvent the discovery request.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7**

Rather, the Court finds that Gail Grigg's email clearly indicates that Defendant Brownfield knew prior to July 11, 2005, that the Griggs were planning on establishing a competing onion marketing firm and that Defendant Brownfield had always intended to work for the Griggs once the firm was established. The Court finds the statement "Here we go, plug your nose and jump in!!!" significant. It clearly indicates that the Griggs and the Brownfields had previously discussed the start-up of Sweet Clover Produce and had planned to operate Sweet Clover Produce together. Indeed, a previous email sent from Janet Brownfield to Gail Grigg indicates that "the guys" had a lunch on Friday, July 8, 2005, presumably to discuss sending the termination letter to KFM. Also, the email indicates that the Griggs intended Brownfield to review the letter prior to it being sent to KFM. Defendant Brownfield's testimony that he knew nothing of the letter prior to finding it on his computer on July 11, 2005, is belied by this email.

Additionally, the Court finds that Defendant Brownfield took significant steps to assist the Griggs in setting up Sweet Clover Produce. Specifically, Defendant Brownfield made arrangements for Lorin Grigg, Jr. to visit Country Fresh Onions and procured onion seeds on behalf of Grigg and Sons, all without KFM's knowledge and while he was employed at KFM.

Circumstantial evidence also indicates that Defendant Brownfield was working with the Griggs prior to July 11, 2005, in order to set up a competing marketing firm. In the spring of 2005, Evans and Schweitzer had talked to the Griggs on the phone regarding the planting of Renegade sweet onions. They also discussed the need for certification of these onions. KFM recommended that the Griggs plant 10 acres as a test plot. Notwithstanding this, the Griggs planted 60 acres of Renegade sweet onions.[11] KFM had no knowledge of the extra 50 acres of Renegade sweet onions and had not made any arrangements to sell the Renegade

---

[11]The average sweet onion farm in the Walla Walla area is about 30 acres.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** ~ 8

1  sweet onions.  It is clear that the Griggs intended to sell these onions in direct
2  competition to KFM and with the help of Defendant Brownfield.

3        Also, by May 2005, Grigg and Sons had 2500 acres of crop in the ground.
4  With respect to hybrid onions, each acre produces between 1,800 and 2,100 50-
5  pound bags of onions.  Consequently, at the time the termination letter was sent,
6  Grigg and Sons would have had to sell a very large supply of perishable hybrid
7  onions. The custom of the industry is to pre-sell approximately fifty percent of the
8  onions before the harvest in order to have a reasonable prospect of completing the
9  sale of the entire crop of onions over the course of a season.

10        If what Defendant Brownfield and the Griggs say is true, that is, there was
11  no intention of hiring Brownfield when the Griggs decided to open Sweet Clover
12  Produce, the practical reality would be that Sweet Clover Produce would compete
13  directly against Brownfield in selling their onions, because presumably he would
14  be still be working for Keystone Fruit Marketing.  Yet, both Griggs testified that
15  they were comfortable with having Brownfield sell their onions, that Brownfield
16  knew their crop better than anybody else, and that  Brownfield was the sole reason
17  that Grigg and Sons came to Keystone Fruit Marketing.  It is incredible to believe
18  that the Griggs were planning on directly competing with the same man they hold
19  in such high esteem.  It is also incredible to believe that the Griggs would plant
20  2500 acres of onions without first knowing who and how they would sell these
21  onions.

22        In sum, the Court does not find credible Defendant Brownfield's testimony
23  that he did not know the Griggs were going to leave KFM, that he had no intention
24  of working for Sweet Clover prior to being terminated by KFM, and that he took
25  no action to assist the Griggs in planning and implementing Sweet Clover Produce.
26  The Court does not find credible the Griggs' testimony that they had no intention
27  of hiring Brownfield to work for Sweet Clover prior to sending the letter
28  terminating their relationship with KFM.  Nor does the Court find credible Lorin

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 9**

Grigg, Jr.'s testimony that if they could not find a salesman to sell the onions, he would do it himself.  Lorin Griggs, Jr. had a full-time job managing Grigg and Sons and did not have the experience that would permit him to market and sell the onions.

Rather, the Court finds that Defendant Brownfield knew that the Griggs were interested in starting a competing onion marketing firm as early as November 2004, and took significant steps to assist the Griggs in setting up Sweet Clover Produce.  The Court finds that, contrary to his testimony, Defendant Brownfield had every intention of leaving KFM as soon as Sweet Clover Produce was up and running.

### CONCLUSIONS OF LAW

Under Washington law, it is well established that a common law duty of loyalty exists between an employee and his current employer, even where no covenant not to compete exists.  *Kieburtz & Assoc., Inc. v. Rehn*, 68 Wash. App. 260, 265-66 (1992).  "During the period of his employment, an employee is not 'entitled to solicit customers for [a] rival business . . .' or to act in direct competition with his or her employer's business.  *Id. citing Restatement (Second) of Agency* § 393 *comment e* (1958).  In like manner, "[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."  *Id.*

*Restatement (Third) of Agency* § 8.01 (2005) provides:

An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.

Section 8.11 provides:

An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when . . . the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10**

agent's duties to the principal.[12]

Comment *b* to section 8.01 states:

> An agent's failure to provide material information to the principal may facilitate the agent's breach of the agent's duty of loyalty to the principal.

*Comment d(2)* to section 8.01 states:

> An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid . . to the agent during the period of the agent's disloyalty.

Washington courts look to the Restatements when there is no case law on point. *Kieburtz*, 68 Wash. App. at 265-66.

Under Washington law, to recover on a claim of tortious interference with business relations, Plaintiffs have the burden of proving by a preponderance of the evidence each of the following elements: (1) that at the time of the conduct about which Plaintiffs complain, Plaintiffs had a business relationship and expectancy with the probability of future economic benefit with Grigg and Sons to market their onions; (2) that Defendant knew of the existence of that business relationship and expectancy; (3) that Defendant intentionally induced or caused the termination of the business relationship and expectancy; (4) that Defendant's interference was for an improper purpose or by improper means; and (5) that the conduct of Defendant was a proximate cause of damages to Plaintiffs. *Westmark Dev. Corp. v. City of Burien*, 140 Wash. App. 540, 557 (2007); Wash. Pattern Jury Instr. 352.02. Interference for improper means is interference that violates a statute, regulation, a recognized rule of common law, or an established standard of the trade or profession. WPI. 352.03.

---

[12]Section 8.11 is a recodification of *Restatement (Second) of Agency* § 381 (1958) which states: an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11**

Plaintiffs presented credible evidence to establish by a preponderance of the evidence that Defendant Brownfield violated his duty of loyalty to KFM and tortiously interfered with the business relationship between KFM and Grigg and Sons.

The circumstantial evidence supports a finding that Defendant Brownfield, while being employed at KFM, worked with the Griggs prior to July 11, 2005, to establish a competing business.  Defendant Brownfield contacted Country Fresh Produce to set up a meeting with the Griggs, which also coincided with the reinstating of the state license to market onions.  Defendant Brownfield attempted to procure seeds for the Griggs, outside the knowledge of KFM.  Moreover, the evidence supports a finding that after the October 2004, meeting, Defendant Brownfield was working with the Griggs to start a competing business.  In doing so, Defendant Brownfield solicited a KFM customer, Grigg and Sons, for a rival business, Sweet Clover Produce, which acted in direct competition with KFM.

Once Defendant Brownfield became aware that Grigg and Sons were contemplating severing their relationship with KFM, Defendant Brownfield had a duty to loyalty to KFM to, at the minimum, notify KFM that Grigg and Sons were thinking about leaving and to assist KFM in its efforts to foster and continue the business relationship. As the evidence shows, Defendant not only failed to notify KFM about any potential problems with Grigg and Sons, but Defendant took positive steps to ensure that the relationship would be irretrievably broken.  As an agent of KFM, Defendant had a duty to act in the best interest of KFM and to act with undivided loyalty.  The evidence supports a finding that not only did Defendant fail to act in the best interest of KFM, Defendant's loyalty was divided in that he had a significant interest in seeing that Sweet Clover Produce come to fruition even though KFM continued to pay Defendant a significant salary.

Likewise, it is undisputed that KFM had a business relationship with Grigg and Sons and had every reason to believe that it would continue to market Grigg

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12**

and Sons onions for the upcoming growing season.  It is also undisputed that, as an employee of KFM, Defendant Brownfield knew of this relationship and expectancy.  Also, Defendant's action was by improper means.  *See Kieburtz*, 68 Wash. App. at 267 (holding that establishing a violation the duty of loyalty establishes that the defendant interfered for an improper purpose or used improper means).

Plaintiffs have presented credible evidence to establish that Defendant Brownfield's conduct was a proximate cause of damages to Plaintiff.  But for Defendant Brownfield assisting in the establishment of Sweet Clover Produce, the Griggs would have continued in their relationship with KFM, especially given that the termination was just prior to the start of the marketing season and the Griggs had a significant number of onions to sell without any means of doing so, absent the cooperation of Defendant Brownfield.[13]

### 3.    Damages

Plaintiffs assert that the proper measure of damages for a breach of the duty of loyalty is the amount of compensation that was paid to Defendant from November 1, 2004 to July 14, 2005.  Plaintiffs argue that Defendant Brownfield should be ordered to repay $145,719.60.[14]  Plaintiffs also ask that the Court award them lost profits as a result of Defendant's tortious interference with their business

---

[13]Plaintiffs argue that the Court should apply the substantial factor test in determining whether Plaintiffs have established that Defendant's conduct was a proximate cause of their damages.  The Court does not need to reach this argument given that it has concluded that Plaintiffs have shown that but for Defendant's conduct, the Griggs would have continued their business relationship with KFM.

[14]Plaintiffs base this figure on the following calculations: $116,552.93 (Defendant's salary from November 1, 2004 to December 31, 2004); $29,166.67 (Defendant's salary from January 1, 2005 to July 14, 2005).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 13**

relationship.

The amount of damages for breach of a duty of loyalty in the employment context is difficult to determine. Under Washington law, the amount of harm is not determinative of the amount of damages. *Cogan v. Kidder, Mathews & Segner, Inc.*, 97 Wash.2d 658, 666 (1982) ("Not only does harm not define the scope of fiduciary duty, it also is not determinative of damages.").

The Restatement (Second) of Agency § 469 (1958) provides:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a willful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

Washington courts have adopted this section.[15]  *See Cogan*, 97 Wash.2d at 667. No Washington courts have applied § 469 to an employment context, however, but other states have. *See Phansalkar v. Anderson Weinroth & Co., L.P.*, 344 F.3d 184, 199 (2nd Cir. 2003) (New York); *ABC Trans. Nat'l Transp. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1315 (1980) (Illinois); *Compass Forwarding Co., Inc. v. Prior*, 2004 WL 2375645 (Mass. App. 2004); (Massachusetts); *Production Resource Group, LLC v. Van Hercke*, 2004 WL 1445126 (Minn. App. 2004) (Minnesota). Generally, these states doe not permit set-off even for properly performed services. *But see Design Strategies, Inc. v. Davis*, 469 F.3d 284 (2nd Cir. 2003).[16]

---

[15]According to the parallel tables in the Restatement (Third) of Agency, section 469 is now set forth in § 801, Com. *d(2)* of the Restatement (Third) of Agency.

[16]In *Design Strategies, Inc. v. Davis,* the district court for the Southern District of New York ordered that the employee forfeit the salary, but not the commission earned during the period of the breach of loyalty and the Second Circuit affirmed. 469 F.3d 284 (2nd Cir. 2003). The district court reasoned:

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 14

New Jersey agency law, however, is more restrictive than these states on the issue of salary forfeiture. *See Cameco, Inc. v. Gedicke*, 724 A.2d 783 (N.J. 1999). In that case, the Supreme Court of New Jersey held:

> the egregiousness of the employee's conduct may affect the employer's right to withhold or recoup the employee's compensation. If the employee directly competes with the employer, aids the employer's direct competitors or those with interests adverse to the employer's interests, participates in a plan to destroy the employer's business, or secretly deprives the employer of an economic opportunity, the employee may forfeit the right to compensation. In contrast, if the employee's breach is minor, involves only a minimal amount of time, or does not harm the employer, the employee may be entitled to all or substantially all of his or her compensation.  In contrast, if the employee's breach is minor, involves only a minimal amount of time, or does not harm the employer, the employment may be entitled to all or substantially all of his or her compensation.

*Id.* at 522.

In *Cameco*, a salaried employee, while working for his employer, supplemented his income by establishing a business that, although it did not compete directly with his employer, may have assisted certain of the employer's competitors. *Id.* at 788.  Clearly, this is not the case at bar.  Rather, here the Court is faced with Defendant's egregious conduct in which Defendant secretly undermined his employer and aided his employer's direct competitor to the detriment of his employer.

The Court concludes that the Washington courts would apply the Restatement (Third) of Agency § 801 to the facts of this case and hold that Plaintiff is entitled to the amount of salary that it paid Plaintiff during the period in which he breached his duty of loyalty. *See Kieburtz*, 68 Wash. App. at 265-66

---

> [the employee] must forfeit the salary that he received during the period of disloyalty, but that he is not required to forfeit any commissions because, unlike the defendant in *Phansalkar*, disloyalty did not arise in connection with any Design transaction from which he was entitled under the terms of his employment agreement to receive a commission, nor did it "taint[ ] or interfere[ ] with the completion" of any sales in relation to which he received a commission.

*Id.* at 301.

In this case, Defendant did not receive any bonus or commission for 2005.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 15**

(recognizing that Washington courts have referenced the *Restatement (Second) of Agency* in many cases and "it cannot be argued that the *Restatement* is irrelevant to decisions make in this jurisdiction."). Thus, Defendant will be required to reimburse Plaintiffs for the salary they paid him during the period of disloyalty, which, according to Plaintiff's evidence, is $145,719.60.

The Court finds that the lost profits from the loss of the Grigg and Sons account to be a reasonable measure of the damages caused by Defendant's tortious interference of the business relationship. By all means, Plaintiff had a reasonable expectation to sell the onions that were in the ground in May 2005. Plaintiff presented the Court with the amount of commissions received from the Grigg and Sons account for the three years KFM sold Grigg and Sons onions. The Court finds that the average of these three years, $537,434.05, to be a reasonable estimate of the lost profits that KFM would have received but for Defendant's tortious interference. The Court awards only one year's worth of lost profits, however, given the deteriorating relationship between KFM, Defendant Brownfield and the Griggs, and the fact that Defendant Brownfield is not prohibited from working for Sweet Clover Produce after his termination from KFM.

Accordingly, **IT IS HEREBY ORDERED:**

Plaintiff is to present a proposed judgment consistent with this Order.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel.

**DATED** this 5th day of May, 2008.

*S/ Robert H. Whaley*

ROBERT H. WHALEY
Chief United States District Judge

Q:\CIVIL\2005\Keystone Fruit\ffcc2.wpd

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 16**